**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Nathaniel I. OSUORJI, Defendant–Appellant.**

No. 93–3182.

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1994.

Decided Aug. 22, 1994.

Brye's case was largely limited to the cost of the    ink on the "filed" stamp.

Jacqueline Oreglia, Office of U.S. Atty., Crim. Div. (argued), Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Kenneth L. Cunniff, Chicago, IL (argued), for defendant-appellant.

Before BAUER and FLAUM, Circuit Judges, and GRANT, District Judge.*

GRANT, District Judge.

Nathaniel Osuorji appeals his conviction and sentence for possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a). He contends that the district court erred when it denied his motion to suppress the fruits of an airport search; that there was insufficient evidence to prove him guilty beyond a reasonable doubt; that the prosecutor's closing statements improperly shifted the burden of proof and denied him a fair trial; and that the two-level enhancement of his sentence for obstruction of justice under U.S.S.G. § 3C1.1 was inappropriate. We have addressed each of these arguments in turn and find them to be without merit. Accordingly, the conviction and sentence are AFFIRMED.

## I. BACKGROUND

Nathaniel Osuorji and Sylvester Adigwu were suspects in an ongoing investigation by Los Angeles authorities into drug trafficking. On the morning of November 11, 1992, Special Agent John Kane of the United States Customs Service and his partner, Agent Jill Brock, went to the Los Angeles International Airport to set up surveillance of Osuorji and Adigwu, whom they had reason to believe would be transporting drugs. Information obtained the day before had revealed that Adigwu had purchased both his ticket and Osuorji's via telephone, and that the two were scheduled to depart for Chicago on American West Airlines Flight 692. The

---

* The Honorable Robert A. Grant of the United States District Court for the Northern District of Indiana is sitting by designation.

agents observed Osuorji and Adigwu arrive at the airport together, and converse before boarding the flight to Chicago. In addition to his carry-on baggage, Adigwu had a large hard-sided suitcase which he checked at the ticket counter. Osuorji had only carry-on luggage when he boarded.

Chicago authorities were subsequently notified that the two black male suspects would be arriving at Chicago's Midway Airport and that they could be carrying a large quantity of drugs. They were provided with the names of both suspects and a description of Adigwu. Officer Gainer of the Chicago Police Department, DEA Agent Gary Boertlein, and a third officer met at Midway Airport to await the arrival of Flight 692.

The flight arrived shortly after 6:00 p.m., and Adigwu immediately left the airport carrying only the luggage which he had carried on board. Gainer and Boertlein followed Adigwu outside of the airport and approached him on the street. They identified themselves, and asked if he would answer a few questions. Adigwu consented both to the interview and a subsequent search of his carry-on luggage. When search results revealed no contraband, Adigwu left and Gainer and Boertlein went back into the airport to the baggage arrival area to continue their surveillance of Osuorji. They observed Osuorji approach the baggage carousel, turn and walk away, leave and reenter the terminal, return to the baggage area, and then return to a seating area where he waited until the unclaimed luggage was placed behind the ticket counter. Osuorji walked to the ticket counter, showed the airline attendant his driver's license for identification, and claimed the hard-sided suitcase which Adigwu had checked in Los Angeles. He then exited the terminal. Gainer and Boertlein followed and approached Osuorji on the street while the other officer positioned himself on an island in the middle of the street. All were dressed in plain clothes with their weapons hidden. When Gainer and Boertlein presented their badges and photo identification and asked Osuorji if he would answer a few questions, he agreed. Osuorji stated that he had just arrived on the America West flight from Los Angeles and presented the agents with his airline ticket and a California driver's license for identification. Gainer and Boertlein both observed that Osuorji appeared nervous and that his hands were shaking during the course of the interview. When asked the purpose of his visit, Osuorji indicated that he was in Chicago for the holiday and was traveling alone, although he was unable to correctly identify which holiday and did not know where he would be staying during his visit. Gainer thereafter explained the purpose of their inquiry and informed Osuorji that they were doing a narcotics investigation at the airport and talked to people coming off of various flights in order to try to stop the flow of drugs. Gainer informed Osuorji that he was not under arrest and that he was free to leave, but that they would appreciate it if he would answer a few more questions. Osuorji agreed. When asked if the bags he was carrying, including the hard-sided suitcase, were his, Osuorji said yes, and stated that he had packed them himself. He indicated that no one had handled the luggage since he packed it, with the exception of the suitcase which he checked in Los Angeles and which had probably been handled by airline employees. Gainer subsequently asked if Osuorji would give his consent to search the bags, and told him that he had a right to refuse his consent. According to the agents, Osuorji consented to the search and handed the smaller of the two carry-on bags to Gainer.

While Gainer was searching the carry-on bags, Osuorji took the key to the hard-sided suitcase out of his pocket, and attempted to give it to Boertlein. Boertlein asked him to hold on to it until Gainer had completed the search of the other bags. During this time, Boertlein and Osuorji engaged in a conversation in which Osuorji stated that he had just taken a job in California as a biotechnician and was scheduled to start work on Monday. When Gainer indicated he was ready to search the suitcase, Osuorji handed him the key. Gainer unlocked the suitcase, searched its interior and found no contraband. He then used his fingers to feel around the lining of the suitcase. Although Gainer felt nothing unusual, he observed that the rivets in the top half of the suitcase were different from those in the bottom and appeared to have

been removed and replaced. He also noted that when he let go of the top of the suitcase it fell to the ground heavily. Gainer accordingly asked Osuorji if he would consent to a search of the lining, and Osuorji agreed. Whereupon Gainer pulled away a corner of the lining, reached in and found an envelope which was later verified to contain 3,466.3 grams of 89% pure heroin. The Agents placed Osuorji under arrest, read him his *Miranda* rights and took him to the DEA office at Midway for further questioning.

During his post-arrest interrogation, Osuorji stated that he was in Chicago for job interviews, although he had no contacts. He told the investigating officers that the suitcase was not his; that it was given to him by an older white man who had been in line with him at the airport in Los Angeles; that the man had asked him to check the bag for him to avoid payment of an excess baggage fee; and that he had agreed. Osuorji indicated that he was waiting at the airport in Chicago for the man to claim the suitcase, and when he failed to appear Osuorji claimed it for him. At the agents' request, Osuorji agreed to try on clothing in the suitcase. The agents testified that the garments fit, although Osuorji attempted to make it appear that they did not.

## II. DISCUSSION

### A. The Motion to Suppress

Although Osuorji did not testify at trial, he did take the stand in his own behalf at a pretrial suppression hearing. His version of the events leading to his arrest differed significantly from that of the agents who were involved. Osuorji testified that he was approached and surrounded by three police officers; that he told the officers that he was in Chicago to look at job prospects, and that he received the suitcase from an older white man in Los Angeles who asked him to check it in for him. Osuorji further testified that the key to the suitcase was tied to the handle of the suitcase and was not in his pocket, and that Agent Gainer never requested his permission to search the suitcase or the lining and never told him he could refuse the search or that he was not under arrest. Ac-

cording to Osuorji's testimony, Gainer searched the hard-sided suitcase *after* he told Gainer it did not belong to him.

Based on her observation of the witnesses and the evidence presented, Magistrate Bucklo found that it was more probable than not that Osuorji did give permission to search the lining of the suitcase. The district court adopted the Magistrate's findings and denied the motion to suppress. Osuorji appeals from that decision contending that the district court erred in finding that the encounter was consensual.

We review the district court's denial of the motion to suppress under the clearly erroneous standard. *United States v. Tilmon,* 19 F.3d 1221, 1223 (7th Cir.1994); *United States v. Wilson,* 2 F.3d 226, 229 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1615, 128 L.Ed.2d 341 (1994); *United States v. Rice,* 995 F.2d 719, 722 (7th Cir. 1993). When the decision rests on a credibility determination, as it does in the present case, "the trial judge's ... choice of whom to believe is conclusive on the appellate court unless the judge credits exceedingly improbable testimony." *United States v. Eddy,* 8 F.3d 577, 580 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1663, 128 L.Ed.2d 379 (1994) (quoting *United States v. Cardona-Rivera,* 904 F.2d 1149, 1152 (7th Cir.1990)). *See also United States v. Sterling,* 909 F.2d 1078, 1085 (7th Cir.1990); *United States v. Chaidez,* 906 F.2d 377, 382 (8th Cir.1990); *United States v. Teslim,* 869 F.2d 316, 321 (7th Cir.1989); *United States v. Black,* 675 F.2d 129, 134 (7th Cir.1982), *cert. denied,* 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).

Osuorji contends that his encounter with authorities at the airport was not consensual, and that his testimony to that effect should have been credited over that of the agents as a matter of law. His argument is premised on the assertion that no reasonable person would give their consent to the destruction of their suitcase, and that his version of the events must therefore be the more credible of the two. Neither the law nor the facts,

however, support his position.[1]

■ Assuming for the sake of argument that the district court had credited Osuorji's testimony during the suppression hearing, the motion to suppress would have been *denied* as a matter of law. If Osuorji had no proprietary interest in the suitcase as he claimed, he had no legitimate expectation of privacy in its contents, and no standing to challenge the reasonableness of the search. *United States v. Mazzone*, 782 F.2d 757, 759 (7th Cir.), *cert. denied*, 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 84 (1986).

■ The district court found, however, that Osuorji's testimony was not credible, and that while it was a close call, it believed that the agents were telling the truth and that Osuorji had given specific consent to the search of the lining. That decision is amply supported by the record.

Osuorji testified that he told the agents in Chicago that he had checked the suitcase in Los Angeles for an older white man, but the two Customs agents from Los Angeles testified that Adigwu checked the suitcase, that Osuorji had only carry-on luggage when he left Los Angeles, and that they never saw Osuorji speak to, or take anything from, an older white man. That testimony was undisputed.[2] Osuorji's version of how he came into possession of the suitcase was thus thoroughly discredited, rendering the remainder of his testimony suspect.

While it may appear somewhat improbable that anyone would give their consent to the type of intrusive search conducted in this case if they knew drugs were hidden within the lining, Osuorji may have believed that to refuse consent would be an admission of guilt. Indeed, according to the agents' testimony, as soon as the drugs were found, Osuorji changed his story regarding who owned the suitcase: a version of the events which is *very* plausible. Under the circumstances, we would be hard-pressed to find that the district court's credibility determination and the denial of the motion to suppress were clearly erroneous.[3] *Eddy*, 8 F.3d at 580; *Cardona–Rivera*, 904 F.2d at 1152.

### B. Sufficiency of the Evidence

■ Osuorji's challenge to the sufficiency of the evidence is similarly without merit. "[A] verdict will withstand a sufficiency of the evidence challenge unless there is no evidence from which the jury can find guilt beyond a reasonable doubt." *Tilmon*, 19 F.3d at 1229 (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). We review the evidence in the light most favorable to the government, *Tilmon*, 19 F.3d at 1229; *United States v. Villagrana*, 5 F.3d 1048, 1051 (7th Cir.1993); *United States v. Van Wyhe*, 965 F.2d 528,

---

1. Osuorji argued that the agents' lack of credibility was further evidenced by an inconsistency on the waiver form completed by Gainer which shows the time of arrest as 6:30, when it actually occurred around 7:00. The district court found the inconsistency insignificant and we agree.

2. Osuorji's testimony during the suppression hearing was limited to events that occurred after he landed in Chicago.

3. Osuorji argues in the alternative that even if he gave a general consent to search the suitcase, that consent would not have included authorization to search behind the lining. The standard for measuring the scope of consent is objective reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). Factors the court must consider include, but are not limited to, the defendant's behavior during the search, the purpose of requesting consent to search, the location of the search, and any show of force. *McGann v. Northeast Illinois Regional Commuter R.R. Corp.*, 8 F.3d 1174, 1179 (7th Cir.1993); *United States v. Gutierrez–*

*Mederos*, 965 F.2d 800, 803 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993) ("scope of a search is generally defined by its express object"); *Chaidez*, 906 F.2d at 383. In the present case, the agents approached Osuorji on a public street, wore plain clothes and had their weapons out of view. They told him that they were looking for drugs, which are frequently hidden, and asked if they could search the suitcase and its lining. Osuorji agreed, placed no explicit limit on the search, and did not object when the agents pulled the lining away from the shell and began to search behind it. Whether such circumstances support a finding of reasonableness, however, is a matter we need not decide. *But see, United States v. Chaidez*, 906 F.2d 377, 383 (8th Cir.1990); *United States v. Olivier–Becerril*, 861 F.2d 424, 425–26 (5th Cir.1988). The district court found that Osuorji gave specific consent to search the lining, and the evidence supports its assessment of credibility.

531 (7th Cir.1992), and will not reweigh the evidence or reassess the credibility of the witnesses. *United States v. Caudill*, 915 F.2d 294, 297 (7th Cir.1990).

■ Osuorji contends that the government failed to prove that he "knowingly possessed" the suitcase and its contents. We disagree. The undisputed evidence showed that Osuorji claimed the suitcase as his own at the airline counter; that he told the agents the suitcase was his; that he had the key to the suitcase; and that the clothing inside appeared to fit. His possession of the suitcase which contained a wholesale quantity of heroin was thus sufficient to support a conviction under 21 U.S.C. § 841(a). *United States v. Collins*, 764 F.2d 647, 652 (9th Cir.1985); *see also United States v. Soto–Lopez*, 995 F.2d 694, 698–99 (7th Cir.1993) (constructive possession sufficient). Proof of ownership was not required. *United States v. Rush*, 890 F.2d 45, 49–51 (7th Cir.1989); *United States v. Moya–Gomez*, 860 F.2d 706, 756 (7th Cir. 1988), *cert. denied, Estevez v. United States*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989).

### C. Closing Statement

Osuorji's next challenge involves a claim of prosecutorial misconduct. Osuorji contends that during his closing argument, the prosecutor made remarks which improperly commented on his failure to take the stand at trial and shifted the burden of proof. Although he never specifically identified the statements to which he refers, the court must assume from the page reference in his brief that Osuorji is referring to the following statement:

> Do you remember Mr. Davy getting up at the beginning of this case and saying, "this is a man who—he did something stupid. I have to tell you, he did something stupid. He was doing a guy a favor and he agreed to take this guy's suitcase and lo and behold, it had heroin in it." Horror of horrors, mistake of a lifetime. Well, when the evidence came in we heard precious little about that, didn't we? We didn't hear much from Mr. Cunniff about the innocent man who did a favor for someone. That's what Mr. Osuorji said happened after he

was arrested. Why didn't we hear about that?

The district court sustained defense counsel's objection to the remark and gave a curative instruction. Osuorji contends that he was nevertheless deprived of a fair trial. We disagree.

■ In assessing a claim of prosecutorial misconduct during closing argument, we must first look at the remarks in isolation and determine whether they were proper. *United States v. Badger*, 983 F.2d 1443, 1450 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993). If they were, our analysis of the defendant's due process claim ends. If, however, we find that they were not, we must then "look at the remarks in light of the entire record to determine if the defendant[ ] w[as] deprived of a fair trial." *Id.* Factors to be considered include:

> 1) the nature and seriousness of the prosecutorial misconduct, 2) whether the prosecutor's statements were invited by conduct of defense counsel, 3) whether the trial court instructions to the jury were adequate, 4) whether the defense was able to counter the improper arguments through rebuttal, and 5) the weight of the evidence against the defendant.

*United States v. Pirovolos*, 844 F.2d 415, 426 (7th Cir.), *cert. denied*, 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988) (citing *Darden v. Wainwright*, 477 U.S. 168, 181–83, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986)). *See also Badger*, 983 F.2d at 1450. "The relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). In the present case, we conclude that they did not.

We assume, as did the district court, that the remarks in question were improper. They mandate reversal, however, only "where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have sup-

ported acquittal." *Lincoln v. Sunn,* 807 F.2d 805, 809 (9th Cir.1987); *United States v. Kennedy,* 714 F.2d 968, 976 (9th Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984). "[W]hen the prosecutorial comment is a single, isolated incident, does not stress an inference of guilt from silence ... and is followed by curative instructions," reversal is not required. *Id.* Such is the case before us. The prosecutor's remarks were isolated, were invited by the remarks made by defense counsel in his opening statement, and were followed by a curative instruction. Given the overwhelming evidence against Osuorji, we can find no prejudice amounting to a denial of due process.

### D. Enhancement Under § 3C1.1

Osuorji was sentenced under the United States Sentencing Guidelines to 188 months' imprisonment. In determining the total base offense level, the district court imposed a two-level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice based upon Osuorji's perjury at the suppression hearing. Osuorji contends that the sentence should be vacated because the district court failed to identify the specific portions of his testimony which it considered to be untruthful, and because the enhancement improperly punishes him for simply denying his guilt and for "exercising his constitutional right to tell his own version of the events." We once again must disagree.

While a simple denial of guilt standing alone may not be a basis for enhancement under § 3C1.1, see U.S.S.G. § 3C1.1, comment. (n. 1); *United States v. Contreras,* 937 F.2d 1191, 1194 (7th Cir. 1991), Osuorji did more than simply deny his guilt. He took the stand during the suppression hearing and told the court *under oath* that the suitcase was not his and that it belonged to an older white man who had asked him to check it for him in Los Angeles and that the agents never asked for his consent to search the luggage. The district court found Osuorji's version of the events to lack credibility. "[The] court based its finding on the testimony of the agents which it believed, contrasted with appellant's testimony which it did not believe. Under *Easley,* that is enough for a specific, independent finding not to be clearly erroneous." *United States v. Soto–Lopez,* 995 F.2d 694, 699–700 (7th Cir.1993) (citing *United States v. Easley,* 977 F.2d 283, 286–87 (7th Cir.1992)). *See also United States v. Fiala,* 929 F.2d 285, 289 (7th Cir.1991) (the denial of guilt exception to § 3C1.1 "does not apply to exculpatory statements made under oath"). That the potential application of § 3C1.1 might have a "chilling effect" on a defendant's decision to testify untruthfully is not disputed. It does not, however, impinge upon any of the defendant's constitutional rights, for "[t]here is no right to commit perjury." *Contreras,* 937 F.2d at 1194 (quoting *United States v. Grayson,* 438 U.S. 41, 54–55, 98 S.Ct. 2610, 2617–18, 57 L.Ed.2d 582 (1978)).

### III. CONCLUSION

For the foregoing reasons, the conviction and sentence are

AFFIRMED.