UNITED STATES of America,
Plaintiff–Appellee,

v.

Frank R. WHITAKER, also known as Gator, and Gary D. Frost, also known as Frosty, Defendants–Appellants.

Nos. 95–3809 & 96–1352.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1997.[1].

Decided Oct. 8, 1997.

---

1. Appeal No. 96–1352 was submitted for decision without argument.

Harvey M. Silets, James M. Witz (argued), Katten, Muchin & Zavis, Chicago, IL, for Defendant–Appellant.

Before BAUER, WOOD, JR., and MANION, Circuit Judges.

BAUER, Circuit Judge.

Frank Whitaker was charged in Counts One and Four of a four-count superseding indictment. Count One charged Whitaker with conspiring to distribute marijuana in violation of 21 U.S.C. § 846 and Count Four alleged that the United States was entitled to forfeiture pursuant to 21 U.S.C. §§ 841(a)(1), 846, and 853. A jury found Whitaker guilty on Count One. He waived trial by jury as to the Count Four forfeiture charge and the district court found him guilty. On November 17, 1995, the district court sentenced Whitaker to 180 months on Count One, to be followed by five years of supervised release. The district court also ordered Whitaker to forfeit to the government $235,535.00 in assets, jointly and severally with certain co-defendants. Whitaker appeals, arguing that the district court abused its discretion by admitting computer records and some testimony against him, and that his due process rights were violated by prosecutorial misconduct.

Gary Frost pleaded guilty to Count One of the superseding indictment and was sentenced to 121 months, to be followed by five years of supervised release. The district court found Frost guilty on Count Four and ordered him to forfeit his residence to the government, along with $235,535.00, jointly with Whitaker and another co-defendant. Frost also appealed, but his counsel filed a motion to withdraw and an accompanying *Anders* brief. We consolidated the cases for appeal. We affirm Whitaker's convictions and sentence in No. 95–3809 and dismiss Frost's appeal in No. 96–1352.

## Background

Frank Whitaker was involved in a large-scale narcotics conspiracy, headed by co-defendant Ralph Solis, which was responsible for distributing large quantities of marijuana from early 1991 until March 22, 1994. After

Kit R. Morrissey (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

an investigation and statements by cooperating codefendants, a superseding indictment was returned on November 22, 1994 against Whitaker, Ralph Solis, Peter Krell, Jeffrey Freund, John Follman, Anthony Gibbons, and Gary Frost, charging them with being members of this drug conspiracy. Testimony at trial established that the marijuana distribution organization operated in the Southern District of Illinois, the Eastern District of Missouri, Texas, Minnesota, and elsewhere.

Solis obtained the marijuana in Texas and Mexico and orchestrated its transportation and distribution into the Southern District of Illinois and throughout the United States. His organization was centered in St. Louis, Missouri, where Solis leased a warehouse in anticipation of large shipments of marijuana. He paid for the lease with the proceeds of marijuana trafficking. Several shipments actually were made to the warehouse. In April of 1994, federal agents inspected the warehouse and found traces of marijuana. Solis used couriers to transport the marijuana to distributors and to return proceeds from its sale back to him, his partner, or his suppliers. Whitaker, Krell, and Freund acted as couriers for Solis. Jimmy Hartline, Frost and Richard Aulabaugh were distributors for Solis in the Southern District of Illinois. Solis was arrested in Madison County, Illinois on November 19, 1993. He was later released and remains a fugitive from justice.

Coconspirators who were cooperating with the government testified at trial that Whitaker was Solis' "right-hand man" and was "second-in-command" of the organization. Testimony also established that Whitaker was responsible for keeping the books for the organization, keeping track of the distributors in the St. Louis area and how much money they owed Solis, and collecting the proceeds from drug sales from the distributors. Whitaker was also responsible for making sure distributors received the marijuana they needed from the warehouse. One uncharged coconspirator, Aulabaugh, testified at trial that, most often, he made his payments to Whitaker. He testified that he had made payments to Whitaker ranging from $30,000 to $90,000. Freund testified

that he had mailed payments of between $30,000 and $40,000 to Mail Boxes, Etc. in the name of "Whitaker Electric." Testimony also established that Whitaker participated in the distribution of very large shipments of marijuana.

In September 1992, Whitaker leased an apartment in Manchester, Missouri for members of the organization to use when they were doing business in the area. Also about that time, Whitaker, Solis, and Hartline purchased a van for members of the organization to use when they were doing business in the area. The van was registered in Whitaker's name but under Hartline's sister's address.

In addition to testimonial evidence as to Whitaker's position and role in Solis' organization, the government also introduced documents and physical evidence to prove Whitaker's involvement. This evidence included leases for the warehouse and the apartment, a tape-recorded conversation between Aulabaugh and Solis which implicated Whitaker, hotel receipts indicating that Whitaker had called Frost's residence, Solis' address book containing Whitaker's telephone number listed under his nickname, "Gator," as well as the telephone numbers for Aulabaugh and Frost, and paperwork found in the van which contained Whitaker's name.

The government also introduced printouts of computer records into evidence. Frost used the computer records to keep track of drug transactions from approximately October 5, 1993 until February 24, 1994. Frost had shown the records and his computerized method for keeping track of drug transactions to Hartline, and other coconspirators knew that Frost kept computer records of the drug business. These computer records were seized from Frost's residence on February 25, 1994. FBI Special Agent Jay Keeven testified at trial as to the seizure of the records. FBI Special Agent Eric Daniel Clouse also testified as an expert witness about the computer records. He testified that, in his opinion, the records pertained to a marijuana-trafficking business. The records contained an account named "Me," which, as Agent Clouse testified, referred to the person running the business and doing the transactions, and an account named

"Cruz," which was Solis' nickname. The "Cruz" account contained a notation that read "Cash Gator $38,000" on October 16, 1993, which corresponded with a $38,000 reduction in the "Me" account. A similar notation of "Cash Gator $49,000" with a corresponding reduction in the "Me" account also appeared on October 27, 1993. "Gator" was Whitaker's nickname.

Frost was one of Hartline's retail customers. Hartline testified that he recruited Frost into the conspiracy in early 1991 when he asked to use Frost's residence in Granite City, Illinois, as an unloading and storage site for marijuana. Frost was paid for the use of his residence and was also given first-pick of the marijuana for his own distribution purposes. Hartline was arrested for possession of marijuana on March 2, 1992, and began to ease himself out of the organization. Frost took over Hartline's business and role in the conspiracy. Couriers continued bringing marijuana to Frost's residence, and Frost continued distributing it to his own customers and to former customers of Hartline.

A four-count superseding indictment was returned on November 22, 1994. Count One charged a narcotics conspiracy in violation of 21 U.S.C. sec.sec. 841(a)(1) and 846, and named Solis, Whitaker, Krell, Freund, Follman, Gibbons, and Frost as defendants, along with six unindicted coconspirators. Count Four alleged that the defendants should forfeit to the United States proceeds from the conspiracy or property used or intended to be used in any manner or part to commit and facilitate the conspiracy. Count Four included, but was not limited to, real property, cash, and substitute assets. Whitaker was convicted by a jury of Count One on February 3, 1995. On May 4, 1995, the district court found Whitaker's relevant conduct on Count One to be responsible for the distribution of approximately 2,000 kilograms of marijuana. The court accordingly sentenced him to 180 months on Count One, to be followed by a five-year period of supervised release. Whitaker waived trial by jury on the forfeiture count and the case was submitted to the district court on the briefs. On May 4, 1995, the district court found Whitaker guilty on Count Four and ordered him to forfeit "$475,000.00 in assets, jointly and severally with certain co-defendants, less $239,465.00 previously forfeited to the Government from co-defendants in this case, leaving the total amount to be forfeited of $235,535.00 to the Government." Whitaker filed a notice of appeal in this Court on November 17, 1995 in No. 95–3809.[2] He argues here that, during his trial on Count One, the district court made several errors in admitting evidence and the prosecution engaged in misconduct.

Frost pleaded guilty to Count One of the superseding indictment. On February 6, 1996, he was sentenced to 121 months, to be followed by five years of supervised release. He was ordered to forfeit his residence and $235,535.00. Frost, represented by Attorney Hess, filed a notice of appeal in No. 96–1352 on February 9, 1996, which we consolidated with Whitaker's appeal. On March 19, 1997, Attorney Falahee, Frost's substitute counsel, filed a motion to withdraw and an accompanying brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), in which counsel argues that there are no non-frivolous grounds for appeal. In accordance with Circuit Rule 51(a), the Clerk informed Frost of his attorney's motion and notified him of his opportunity to respond, which he did on April 10, 1997.

## Analysis

### No. 95–3809—FRANK WHITAKER

1. *Admission of Computer Printouts*

■ Whitaker's first argument on appeal is that the district court erred in admitting the printouts of Frost's computer records against him because they were not properly authenticated and because the government did not lay a proper foundation. He also argues that these records were critical to the government's case because they established Whitaker's link to the conspiracy, and their

---

**2.** Whitaker did not file a timely notice of appeal from the district court's initial entry of judgment and sentence against him on May 4, 1995. Instead, he filed a Motion for Leave to File Late Notice of Appeal. The district court construed that motion as a habeas petition for relief pursuant to 28 U.S.C. § 2255, granted Whitaker relief, and resentenced him on November 17, 1995.

admission into evidence violated his due process rights to a fair trial under the Fifth Amendment. The government responds that Whitaker did not properly object to the lack of authentication of the computer records, but merely objected to the lack of foundation. The government therefore contends that we can review this matter only for plain error, which, it believes, Whitaker cannot show.

First, while it is true that a specific objection made on the wrong grounds and overruled precludes a party from raising a specific objection on other, tenable grounds on appeal, *see Prymer v. Ogden*, 29 F.3d 1208, 1213–14 (7th Cir.), cert. denied, 513 U.S. 1057, 115 S.Ct. 665, 130 L.Ed.2d 599 (1994), we do not have to deal with that problem here. Although Whitaker's counsel may not have used the buzz-word "authentication," he did timely and properly object to both the foundation and the authentication of the computer records during Agent Keeven's testimony. Counsel stated:

> DEFENSE: Well, I have several objections. First is lack of foundation, predicate, as to the agent said that we obtained. I don't know if he had any personal knowledge of the acquisition of these records or these computer records. We don't know how they were printed.
>
> THE COURT: You are talking about the printouts?
>
> DEFENSE: Yes. Secondly, I believe that, and I don't want to jump ahead of myself here, but I believe that the United States Attorney may be attempting to elicit what is contained in those records, and perhaps also what they mean, and I don't believe at this point that a foundation has been laid.
>
> THE COURT: Let's establish whether she is.
>
> GOVERNMENT: I was just going to have Agent Keeven point out something. He is not going to testify to what it means, but point out things like cash to Gator and the amount of money, cash to Sly. There will be testimony of an expert from the FBI lab in Quantico, Your Honor, that has evaluated the records and who will testify as to what they mean. Agent Keeven won't be doing that other than to be pointing out this.
>
> DEFENSE: First of all, I don't know if Agent Keeven is even the agent that retrieved these things off of the disk. I assume they were on a disk. We don't even know that. We don't know if the records are accurate or if they were retrieved accurately.
>
> THE COURT: All right. Counsel for the Government will establish as a basis for the testimony who did this and what is the acquaintanceship with what the product is, whether he was present or-
>
> GOVERNMENT: Okay. I think he can testify. I am not sure. I think he will testify that he sent the disks to the IRS lab. This is what IRS—Not lab, IRS office. This is what he received, and he later observed them being retrieved off of the computer itself with the help of Gary Frost.
>
> THE COURT: And will he be able to testify also that he was with—You all are challenging me on my knowledge about computers, but that it was with software seized from the Frost residence under this warrant?
>
> GOVERNMENT: Yes, sir.
>
> DEFENSE: My concern is, I believe it takes—I don't know if it is an expert status or not, but it takes, just because a disk is seized and information gotten off of the disk doesn't necessarily mean it was put there in this fashion and so forth. I think that this is not the correct witness to testify. The IRS people who print this can come in and say this was how the disk was formatted and this is the product and we printed it and this is how it works.
>
> THE COURT: I think the witness can testify as to the seizure of the disk, that he was present when it was used in the computer, and this is what came out of the computer.
>
> DEFENSE: But I want my objections noted for the record.
>
> THE COURT: I understand. Your objection is overruled. It is on the record. All you are going to do is to have him point out a couple of the entries, not to go into interpretations here.

GOVERNMENT: No, I don't believe he can interpret them.

Whitaker's counsel made no further objections and did not ask the court to reserve ruling until he could cross-examine Agent Keeven as to authenticity or foundation.

Nonetheless, we are certain that this discussion was more than sufficient to preserve Whitaker's objections both as to authenticity and as to the propriety of the foundation laid. Citing the particular provision of the rule is not necessary if counsel states the reasons for the objection or, like here, it is clear from the context. *See also* Fed.R.Evid. 103(a)(1) (requiring a timely objection or motion to strike on the record stating the specific ground of objection, if the specific ground is not apparent from the context). Counsel's questions about the accuracy of the retrieval of the records were sufficient to preserve his objection as to authenticity, and counsel clearly stated his objection as to foundation. We therefore review the district court's decision to admit the records for abuse of discretion and not, as the government suggests, for plain error.[3]

■ The district court has broad discretion in determining the admissibility of evidence. *United States v. Pulido*, 69 F.3d 192, 201 (7th Cir.1995). Our standard of review in determining whether the district court committed reversible error in either admitting or excluding evidence is abuse of discretion. *United States v. Payne*, 102 F.3d 289, 294 (7th Cir.1996). "Appellants who challenge evidentiary rulings of the district court are like rich men who wish to enter the Kingdom; their prospects compare with those of camels who wish to pass through the eye of a needle." *United States v. Glecier*, 923 F.2d 496, 503 (7th Cir.), *cert. denied*, 502 U.S. 810, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991) (citing Matthew 19:24).

■ Federal Rule of Evidence 901(a) provides the requirement for authentication of evidence:

> The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

Fed.R.Evid. 901(a). Whitaker argues that the prosecution failed to comply with the requirements of Rule 901(a) with respect to the computer printouts because it never supplied witnesses who had personal knowledge of the computer system's operation or who could confirm the accuracy of the input to and output from the computer.

The government laid the foundation for the computer records and provided their authentication through the testimony of FBI Special Agent Jay Keeven. Agent Keeven testified that the records were retrieved from Frost's computer, which was seized during the execution of a federal search warrant of Frost's home in February 1994. The records were retrieved from the computer using the Microsoft Money program. Agent Keeven was present when that program was installed on the computer and when the records were retrieved. Agent Keeven testified concerning his personal knowledge and his personal participation in obtaining the printouts. On cross-examination, the defense did not ask Agent Keeven any questions about how the disks were formatted, what type of computer was used, or any other questions of a technical nature. In sum, his testimony was sufficient to establish the authenticity of the computer records of the drug business, and the district court was correct in admitting the records.

■ Later in the trial, after the testimony of Agent Keeven, the government called FBI Agent Clouse to the stand as an expert to

---

**3.** Whitaker also argues that a proper foundation was not laid for the computer records in that the government failed to meet the requirements of the "Best Evidence Rule." Federal Rule of Evidence 1001(3) requires that "[i]f data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately, is an 'original.'" Fed. R.Evid. 1001(3). Thus, in order to meet the requirements of this rule, a proper foundation must be laid that the printout accurately reflects the data stored on the computer. We need not address this argument, however, because the issue is whether the district court abused its discretion in admitting the records, not whether the contents of the records were accurate.

interpret the computer records for the jury.[4] Agent Clouse testified that he worked for the Racketeering Records Analysis Unit of the FBI, and as part of that work he had examined suspected drug and money laundering records in more than 400 cases to determine whether they were clandestine in nature and what notations on those records meant. The court accepted Agent Clouse as an expert in the field of analysis of suspected drug records.

Whitaker attempts to discredit Agent Clouse's testimony by pointing out that Agent Clouse effectively admitted on cross-examination that he was not an expert on computers. Agent Clouse did testify on cross-examination that did not know whether the documents were properly retrieved from the computer and that his totals could be affected if the documents were retrieved improperly. That is irrelevant, because that was not the purpose of Agent Clouse's testimony. He was called as a witness to interpret the records, not to testify as to the method by which they were retrieved—that was the purpose of Agent Keeven's testimony. Agent Keeven had already testified as to how and when the records were retrieved. Agent Clouse, rather, provided expert testimony as to the meaning of the records, and he certainly was qualified to interpret and explain the records to the jury. As he stated, "I can vouch for the results that I got from the documents that I have." Agent Clouse testified that the computer records he was asked to interpret did indeed represent "records of a marijuana distribution business." Agent Clouse then went on to interpret government enlargements of charts in order to help the jury understand the information he had garnered from the drug records. He testified that the records covered the time period from October 5, 1993 until February 24, 1994. He explained to the jury how the "Me" Account reflects "the person who is actually running the business." He

also testified as to notations on the records referring to "Gator" and "Sly."[5] He testified that those notations on October 10, 16, and 27, 1993, with references to "Gator" involved $20,000 on October 10, $38,000 on October 16, and $49,000 on October 27. These notations corresponded to ingoing and outgoing cash flows from the "Me" accounts into various other accounts. Agent Clouse testified that he knew the names on the accounts because they corresponded to the names of the computer files. It was not Agent Clouse's duty as a witness to authenticate or lay the foundation for the records; he was testifying as to the interpretation of the records once they were retrieved from the Microsoft Money personal finance program.

Whitaker is incensed by the fact that codefendant Gary Frost assisted Agent Keeven in retrieving the computer records from his computer and by the fact that the government did not establish a chain of custody for the computer or the contemporaneously-seized disks. Whitaker argues: "The fact that the prosecution allowed Frost access to his former computer while it was in government custody to assist in producing the key piece of physical evidence against Whitaker, undermines, rather than supports, the authenticity of the printouts." He believes that allowing Frost access to the computer could have affected the requirement that the computer and disks be in substantially the same condition as when the crime was committed. *See United States v. Lott,* 854 F.2d 244, 250 (7th Cir.1988). He believes that with a few rapid keystrokes, Frost could have easily added Whitaker's alias, "Gator" to the printouts in order to finger Whitaker and to appear more helpful to the government. This is almost wild-eyed speculation and without some evidence to support such a scenario, we will not disturb the trial judge's ruling.

■ Even assuming the court erred in admitting the computer records, it would be

---

4. Agent Clouse testified that he did not initially have all the records he needed to perform the analysis. He therefore traveled to the Southern District of Illinois, where he met with an IRS agent and was present when the additional records were retrieved from the computer. The district court also admitted the additional records.

5. Agent Clouse did not testify as to the identity of "Gator" and "Sly," only to the existence of the notations. The government used other witnesses to identify these nicknames.

error harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Whitaker was substantially involved in this wide-ranging drug conspiracy, and the evidence against him, even apart from the computer records, persuasively established his guilt. In addition to these records, the jury heard overwhelming evidence connecting Whitaker to the Solis drug conspiracy, some of which we recounted above. Although Whitaker argues that much of the testimonial evidence against him came from coconspirators who were biased and had motives to lie, the jury was certainly aware of the status of those witnesses and could have chosen to disbelieve them. The jury was instructed as to the credibility of those witnesses, and the jury heard closing argument from the defense that centered on the lack of reliability of the cooperating witnesses. Although we do not believe admitting these printouts was an abuse of discretion, even if it was, their admission was harmless error.

**2.** *Admission of Gary Frost's Testimony*

■ Whitaker also argues that his rights under the Confrontation Clause of the Sixth Amendment were violated by the introduction of "unreliable hearsay testimony of a non-testifying co-conspirator through an expert witness" and that this violation requires him to be granted a new trial. Whitaker contends that the government presented Agent Clouse as a "mouthpiece" for co-defendant Gary Frost, and that Agent Clouse relied heavily on conversations with the "highly suspect" Frost in forming his opinions about the meaning of the computer records. Whitaker argues that this sinister substitution of the neutral FBI expert for the motive and bias-laden co-defendant violated his right to confront Frost, and likely affected the verdict because of the significance the computer records must have had in the jury's eyes. Therefore, Whitaker argues, the district court's error in admitting this hearsay was not harmless beyond a reasonable doubt.

Clouse testified on cross-examination as follows:

DEFENSE: Were you aware that the person whose computer these things were generated from was a cooperating witness at that time?

CLOUSE: Yes.

DEFENSE: Did you have a chance to talk with him about these things?

CLOUSE: Yes, I did.

Whitaker also places reliance on the following interchange to establish that Agent Clouse relied on Frost to form his conclusions about the computer records:

DEFENSE: What does the Me account refer to?

CLOUSE: The Me account is the business account.

DEFENSE: Okay. That is Mr. Frost's business account, is that right?

CLOUSE: *That is what I was led to believe by Mr. Frost.*

DEFENSE: Of this account, separate accounts were kept for various individuals, is that right?

. . .

CLOUSE: Yes.

DEFENSE: One of these separate accounts was the Cruz Account?

CLOUSE: Yes.

DEFENSE: And from your interpretation of the records, what was the Cruz Account about? What was that keeping track of?

CLOUSE: Amounts of money for marijuana.

DEFENSE: From who to whom?

CLOUSE: There is no way to be able to tell which way this is flowing. It could go either way.

DEFENSE: Okay. That is what I want to get to. It could be that Frost is supplying marijuana to Cruz [Solis]. Let's say that is the Cruz Account or Cruz could be supplying marijuana to Frost. You can't tell.

CLOUSE: The money is flowing from the Me Account and it appears to be flowing into the Cruz Account.

DEFENSE: Okay. When on that 10–16 day the money from the Me Account that went to the Cruz Account had Gator associated with it, is that right?

CLOUSE: Yes.

DEFENSE: Okay. Now, do you know from your extensive expertise in this matter what that means? What does that 10–16 entry to Gator mean?

CLOUSE: Strictly from the records, I cannot make a determination on it. That is just a notation in the record.

DEFENSE: *We would need Mr. Frost to tell us that, is that right?*

CLOUSE: *Mr. Frost put it there. I believe it was his computer.*

(emphasis added). Whitaker also finds the following interchange on redirect of Agent Clouse, to which his counsel objected on hearsay grounds, highly suspect:

GOVERNMENT: Agent Clouse, are your findings independent of any conversations you had with Gary Frost?

CLOUSE: Yes, ma'am.

GOVERNMENT: Based on your conversation with Gary Frost, however, the suggestion [by defense counsel on cross-examination] that Cruz [Solis]—I am sorry—Frost was supplying Cruz [Solis], is that consistent or inconsistent with your conversation?

At this point, defense counsel's hearsay objection was overruled. At a sidebar conference, defense counsel stated:

DEFENSE: Judge, obviously as I brought out, Mr. Frost and this agent upon a meeting, whereupon Mr. Frost explained to him, I believe, how his record keeping system worked. Certainly this was not made in furtherance of the conspiracy. Certainly it is an out of Court statement, but it is an out of Court statement made by a witness, and it is certainly being offered for the truth of the matter asserted as to what Mr. Frost said.... [I]f this agent is testifying as to what he knows that is one thing. If he is testifying what he has come to believe based on what other people told him, I would have to object.

The court overruled the objection, after which Agent Clouse testified that the suggestion that money was flowing from Cruz (Solis) to Frost was inconsistent with his conversation with Frost.

■ We do not believe that Agent Clouse's testimony was hearsay. It is clear that the prosecution was not attempting to elicit information about the "truth" of what Frost may have related to Agent Clouse. Rather, in an attempt to rehabilitate Agent Clouse from defense counsel's suggestion that he did not form his conclusions correctly, the prosecution was only trying to unearth whether Agent Clouse's conclusions were "consistent" with conversations with Frost. And, certainly, Agent Clouse was permitted to rely on conversations with Frost in order to form his opinions about the records. *United States v. Rollins*, 862 F.2d 1282, 1293 (7th Cir.), *cert. denied*, 490 U.S. 1074, 109 S.Ct. 2084, 104 L.Ed.2d 648 (1989). This is the only testimony Whitaker can point to buttress his argument about Agent Clouse being a "mouthpiece" for Gary Frost.

■ In addition, in light of the limited nature of this testimony about being "consistent" with Frost, and in the context of a four-week trial recorded in twenty-eight volumes of transcripts, we can hardly say that these slight references to Frost were not harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). As noted above, the testimony was merely elicited on redirect examination. The government was attempting to clarify the testimony of Agent Clouse as to what the records showed vis-a-vis the direction the drugs and the money were flowing. That is, the prosecution was trying to verify that Solis was the supplier of the drugs and that Frost was a distributor in the organization. In light of the other substantial testimonial evidence about the structure of the organization and Whitaker's role in it, this evidence is, at most, cumulative. Moreover, as we explained above, the cross-examination opened the door to the rebuttal.

Whitaker also argues that this testimony allows for the inference to be drawn that Agent Clouse was lying when he testified that he formed his opinions independent of any conversations with Gary Frost. However, that kind of credibility determination is within the fact-finding province of the jury. *See United States v. Curry*, 79 F.3d 1489, 1497 (7th Cir.1996) (quoting *United States v.*

*Hatchett,* 31 F.3d 1411, 1416 (7th Cir.1994); *United States v. Lakich,* 23 F.3d 1203, 1210–11 (7th Cir.1994)).

Whitaker is upset by the highly damning evidence of the computer records which were used against him at trial. However, neither his argument concerning the admission of the records nor the attempt to discredit Agent Clouse's testimony by connecting it to Frost can enable him to avoid the government's use of the records against him.

### 3. *Prosecutorial Misconduct*

■ Finally, Whitaker contends that the government engaged in misconduct during his trial when it sought to admit evidence that it knew or should have known was inadmissible and when it engaged in improper and impermissible "vouching." Whitaker argues, again, that the use of Agent Clouse as a "mouthpiece" for an unavailable witness was so obvious an attempt to proffer improper hearsay evidence that it constituted prosecutorial misconduct.

Whitaker first argues that the government knowingly and impermissibly tried to admit hearsay of Solis through Agent Keeven. Whitaker points to the following testimony by Agent Keeven:

GOVERNMENT: Following the arrest of Mr. Solis, did you have occasion on that date to escort Mr. Solis to the courtroom?

KEEVEN: It was sometime after that, the arrest of Mr. Solis on the 19th of November of 1993.

GOVERNMENT: All right. In the process of—What were you doing with him? Following his arrest, were you transporting him back to the custody of the marshal or something like that?

KEEVEN: Yes, ma'am. We had attempted a proffer with him and he and his attorney were not agreeable to the terms of the proffer letter and I was asked along with Special Agent Etchison to return Mr. Solis to the custody of the United States Marshal, which is located in the lower level of this building.

GOVERNMENT: During the escorting of Mr. Solis back to the marshals, did he make a statement to you?

KEEVEN: Yes, ma'am.

GOVERNMENT: Did he make more than one statement to you?

KEEVEN: Yes, ma'am.

GOVERNMENT: Would you please outline for the ladies and gentlemen of the jury what he said?

DEFENSE: Your Honor, I have to object. This is hearsay. The Government knows it is hearsay. (Whereupon the following proceedings were held at side bar, out of the hearing of the jury.)

DEFENSE: Judge, as I understand it Mr. Solis is in custody, under arrest, and he makes a statement. It is not a co-conspirator's statement, not made in furtherance of the conspiracy, and it is an out of Court statement other than in this. To me that is hearsay.

At a sidebar conference, the prosecutor attempted to explain that she believed Solis' statement was the statement of a co-conspirator made in furtherance of the conspiracy. *See* Fed.R.Evid. 801(d)(2)(E). Because Solis was not available to the government at the time of trial and he was a fugitive from justice, however, the district court sustained the objection. In response to Whitaker's counsel's request to instruct the jury to disregard the whole line of questioning, the district court replied: "I have sustained the objection. There has been nothing of prejudicial nature admitted. I am not going to strike any of that." Whitaker subsequently moved for a mistral but the district court denied the motion, saying, "I do not anticipate that the Court will have to rule on a motion for mistrial every time it sustains one of the defendant's objections."

Whitaker contends that this transcript shows that the prosecution attempted to elicit testimony which it knew or should have known was inadmissible, and this attempt constituted prosecutorial misconduct worthy of reversing his conviction. We disagree. The government did not engage in misconduct in attempting to have this testimony admitted in light of Solis' status as a co-conspirator. Further, we do not think that Whitaker could have been prejudiced by the testimony that was allowed prior to the ob-

jection. There was no indication as to what Solis actually said or whether it had anything whatsoever to do with Whitaker. We do not find any abuse of discretion in the court's rulings on that testimony or on the motion for a mistrial.

 In addition, Whitaker suggests that certain comments by the government in closing argument were misconduct because they constituted impermissible "vouching" under *United States v. Spivey*, 859 F.2d 461, 466 (7th Cir.1988). In reviewing allegations of improper comments by a prosecutor, we follow a two-step course. We first look at the comments in isolation to determine if they were improper. *United States v. Morgan*, 113 F.3d 85, 89 (7th Cir.1997) (citing *United States v. Severson*, 3 F.3d 1005, 1014 (7th Cir.1993); *United States v. Badger*, 983 F.2d 1443, 1450 (7th Cir.), *cert. denied*, 508 U.S. 928, 113 S.Ct. 2391, 124 L.Ed.2d 293 (1993)); *United States v. Butler*, 71 F.3d 243, 254 (7th Cir.1995). If we find the comments are proper, the analysis ends. If we find they are improper, we must then examine the comments in light of the record as a whole to determine whether the comments deprived the defendant of a fair trial. *Morgan*, 113 F.3d at 89; *Butler*, 71 F.3d at 254. To determine whether the defendant was deprived of a fair trial, we look at five factors: (1) the nature and seriousness of the misconduct; (2) whether the prosecutor's statements were invited by conduct of defense counsel; (3) whether the trial court's instructions to the jury were adequate; (4) whether the defense was able to counter the improper comments through rebuttal; and (5) the weight of the evidence against the defendant. *Butler*, 71 F.3d at 254 (citing *Badger*, 983 F.2d at 1450; *United States v. Osuorji*, 32 F.3d 1186, 1191 (7th Cir.1994), *cert. denied*, 513 U.S. 1119, 115 S.Ct. 919, 130 L.Ed.2d 799(1995)). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.... The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (citations and internal quotations omitted). To meet his

burden, Whitaker must show that it is at least likely that the comments affected the outcome of his trial or caused the jury to find him guilty when they otherwise might not have. *Morgan*, 113 F.3d at 89. If the comments did not render the trial unfair, there is no constitutional error and we cannot reverse, regardless of our desire to deter improper conduct. *Id.*

The government's challenged statements from closing argument went as follows:

> When we interview people alleged to be involved in drug trafficking, ladies and gentlemen, we don't take what these people say at face value. We take precautions to make sure that any individual coconspirator being interviewed, that he is not told what other co-conspirators—.

Defense counsel objected to this statement, and the court sustained the objection and said "Counsel may not vouch for the witness." Whitaker also attacks the following statement next made by the prosecutor:

> Take a look at the plea agreements, ladies and gentlemen, that these individuals have entered into with the United States. I believe that you will find that the Government has struck a bargain that is in it's [sic] favor and that these plea agreements assure us of what these witnesses are testifying about.

Defense counsel also objected to this statement as improper vouching, and the court again sustained the objection, instructing the prosecutor not to vouch for the truthfulness or testimony of any witnesses. She continued:

> Ladies and gentlemen, on numerous occasions the defense attorneys tried to show here that we had suggested to witnesses what to say, that statements of others had been shared with them, and that was simply not the case and you heard the testimony—

The court sustained an objection to this line of argument as well. Defense counsel then moved for a mistrial, arguing that the government's alleged vouching was totally improper, and, when taken with the earlier motion for mistrial referenced above about the Solis "hearsay," "it is absolutely clear

that she has repeatedly and intentionally improperly vouched." The court denied this motion for a mistrial, saying that it had sustained the objections before some of the alleged vouching occurred, and that it would not instruct the jury that any vouching was "inappropriate and incorrect and impermissible." The court replied: "I will not give that instruction. I will give an instruction that, as I have already told counsel, that counsel may not vouch for the witness and the jury is to disregard any such comments, and I deny the motion for mistrial."

Although the prosecutor's comments may be approaching the direction of impermissible vouching, they had not yet arrived. Defense counsel's objections and the district court's sustaining them seem to have nipped any problem in the bud. The jury never did hear the prosecutor make any statement assuring the jury that she was vouching for the truthfulness of the witnesses; any such comments were cut off before they were realized. As for what was said to the jury, we do not find it to be improper as a matter of law. In any case, the comments did not come close to denying Whitaker a fair trial, and are not close to the kind of vouching that we found in *Morgan* to be improper. *See Morgan*, 113 F.3d at 88–89 ("The challenged comments were improper, not because they vouched for the witness's credibility, but because the prosecutor invited the jury to consider issues beyond the guilt or innocence of the defendant."). That did not happen here. Moreover, the court instructed the jury that any type of vouching should be disregarded, and the defendant raised the issue of witness credibility in closing argument, but the jury nonetheless returned a guilty verdict. And again, the case against Whitaker was strong and the evidence against him was overwhelming. We are certain that Whitaker was not denied a fair trial.

### No. 96–1352—GARY FROST

In connection with his involvement with the Solis drug organization, Gary Frost pleaded guilty to the Count One conspiracy to distribute marijuana and was sentenced to 121 months to be followed by a five-year period of supervised release. He (along with Whitaker and another co-defendant) was also ordered to forfeit $235,535.00 and his residence at 1350 Chouteau Place Road, Granite City, Illinois. He filed an appeal on February 9, 1996, challenging both his sentence and his conviction. On March 19, 1997, Frost's counsel filed a motion to withdraw and to dismiss the appeal because, in his opinion, there were no non-frivolous grounds for appeal. *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); *United States v. Wagner*, 103 F.3d 551 (7th Cir.1996). In accordance with Circuit Rule 51(a), the Clerk of this Court informed Frost of his attorney's motion and notified him of his opportunity to respond, which he did. We will grant a motion to withdraw if the possible issues for appeal are "groundless in light of legal principles and decisions." *United States v. Eggen*, 984 F.2d 848, 850 (7th Cir.1993) (citing *McCoy v. Court of Appeals*, 486 U.S. 429, 436, 108 S.Ct. 1895, 1900–01, 100 L.Ed.2d 440 (1988)).

As indicated above, federal and state authorities conducted a search and seizure at Frost's residence on February 25, 1994. During the raid, the agents seized a large scale, a small quantity of marijuana, $34,660.00 in cash, an address book with the pager numbers of Solis and Krell, and Frost's computer, which was discussed above. Frost was also fingered by one of his customers, at whose home twenty pounds of marijuana were recovered. Frost then began cooperating with federal and state authorities investigating the Solis organization.

Frost's original attorney, David K. Stalker, contacted the government about Frost making a proffer and cooperating with the government's investigation. Frost entered into a written proffer on March 25, 1994. Pursuant to the terms of the proffer, Frost met with federal agents four times between March and August of 1994. During these interviews, Frost gave specific information about the conspiracy, provided authorities with the password to his computer, and discussed the computer records with the authorities after they had retrieved and printed them. He also admitted that he stored large quantities of marijuana at his residence for Hartline.

Around June 20, 1995, Frost and his attorney negotiated a plea agreement with the government. The agreement was never presented to or approved by the district court. This plea agreement required Frost to plead guilty to an information charging conspiracy to distribute marijuana in violation of 21 U.S.C. § 846. The government agreed that the total quantity of marijuana constituting Frost's relevant conduct would be between 100 and 400 kilograms. The government also agreed to recommend a three-level reduction of his base offense level for acceptance of responsibility and for substantial assistance. Notwithstanding the Guidelines, the agreement acknowledged that Frost was subject to a mandatory minimum of five years, but that the government would not pursue forfeiture against any of Frost's assets, other than the cash seized at his residence.

The first indictment returned in connection with this conspiracy, dated June 22, 1994, did not name Frost. Due to scheduling conflicts, Frost's attorney did not schedule a hearing for Frost to enter his guilty plea to the information. The prosecutor handling the case wrote two letters to Stalker about presenting Frost for his guilty plea. The second letter, dated October 21, 1994, informed Stalker that if Frost did not enter a plea by November 10, 1994, the government would consider the plea agreement breached and would present the case to the grand jury. Stalker still never presented Frost to enter his plea, the plea was never approved by the court or reduced to judgment, and Frost never pleaded guilty to any information.

Instead, the grand jury returned a superseding indictment on November 22, 1994, which added Frost as a defendant in Counts One and Four. Frost initially pleaded not guilty to both counts on November 23, 1994. On December 23, 1994, the government filed a motion to disqualify Stalker because Stalker also represented Hartline, who would be called as a witness against Frost as to Frost's relevant conduct. The court disqualified Stalker on December 29, 1994. On January 11, 1995, Attorney Frederick J. Hess entered an appearance for Frost as retained counsel.

On April 14, 1995, Frost withdrew his plea of not guilty and pleaded guilty to the Count One conspiracy. A bench trial was held on the forfeiture issue from May 30 to June 1, 1995, during which the parties agreed they would present evidence on the issue of the amount of marijuana which should be attributed to Frost. On June 26, 1995, the district court issued a memo finding that Frost's relevant conduct consisted of between 1,000 and 3,000 kilograms of marijuana, with a conservative estimate being 1,250 kilograms. The district court found that testimony from codefendants Hartline, Freund, and Krell "overwhelmingly showed that Frost was intricately involved in both the distribution and sales operations of the Solis conspiracy." The district court explained:

> Frost provided his home in Madison County, Illinois, for use by the conspiracy as a stash house, for which he was paid by the load. Frost was present whenever a load was delivered, helped unload and weigh it, provided packaging material on occasion, helped re-package and store the marijuana, and helped load up that portion that was being sent on to different areas, such as New York, Pennsylvania, Minnesota, Oregon, California, and other places for further distribution. Frost also kept computer records of the transactions, albeit to the dismay of all the members of the conspiracy, including Frost. As a part of his fee for storing the marijuana, Frost was given first choice out of the marijuana for sale to his customers....

On February 6, 1996, the court sentenced Frost. The court ordered Frost to forfeit his residence and $235,535.00. The court determined that Frost's base offense level was 32 and his criminal history category was I. The applicable sentencing range for that level, 121 to 151 months, was greater than the statutory mandatory minimum, but the court denied Frost's petition to be sentenced pursuant to the safety valve provision under 18 U.S.C. § 3553(f). The court then sentenced Frost to 121 months. Frost, represented by Attorney Hess, filed a notice of appeal on February 9, 1996, and his case was consolidated with Whitaker's. On March 11, 1996, Hess filed a motion to withdraw as Frost's

counsel. On August 22, 1996, we appointed Hess to represent Frost on appeal pursuant to the Criminal Justice Act. On September 9, 1996, Frost filed a *pro se* motion to discharge Hess, which we granted on the same day. Attorney Patrick J. Falahee was substituted as counsel for Frost, and on March 19, 1997, Falahee filed the *Anders* brief we address here.

Attorney Falahee identifies the following potential grounds for appeal in his *Anders* brief: (1) whether Frost was entitled to specific enforcement of his initial plea agreement; (2) whether Attorney Stalker or Attorney Hess provided ineffective assistance of counsel in failing to perfect the initial plea agreement; (3) whether the district court clearly erred in calculating the amount of marijuana attributable to Frost; (4) whether the district court's determination that Frost was not entitled to a two-level reduction for acceptance of responsibility was clearly erroneous; and (5) whether the district court erred in failing to sentence Frost under the "safety valve" provision, 18 U.S.C. § 3553(f). In response to Falahee's *Anders* brief, Frost raised three issues that he believed required "further investigation by competent counsel" and an evidentiary hearing: (1) whether Stalker had a conflict of interest which sabotaged the plea negotiations; (2) whether the government breached the plea agreement by asking for additional forfeiture; and (3) whether Stalker's or Hess's representation constituted ineffective assistance of counsel in connection with the failed plea.

■■■ As an initial matter, we must clarify what is in issue here. The case that we are addressing is the case stemming from the government's superseding indictment of November 22, 1994. Frost pleaded guilty to the Count One conspiracy charge in that indictment on April 14, 1995. He pleaded guilty without benefit of a plea agreement. He was tried by the court as to the Count Four forfeiture charge. The original plea agreement was never presented to the district court for approval and judgment on that plea was never entered. That is the subject of Falahee's first two potential issues on appeal and all three of Frost's potential issues on appeal. We are, however, unable to enter-tain any arguments as to the benefits Frost thought he would receive as a result of the first negotiations. That deal never came to fruition. *Why* that agreement was not reduced to judgment is a question that is now beyond the scope of our review; all we could consider would be any potential arguments in connection with the guilty plea that Frost did enter. Frost has raised none.

We have reviewed the transcript of the April 14, 1995 hearing wherein Frost pleaded guilty. At that hearing, Frost answered affirmatively to all of the district court's questions regarding the effect of his plea, was apprised of his constitutional rights, and was informed of all the possible penalties he faced depending on the amount of marijuana the district court ultimately found attributable to him as relevant conduct. The government described the evidence that would be presented at trial, suggested that the evidence would show that Frost was responsible for between 1,000 and 4,000 kilograms of marijuana, explained that it would seek a base offense level of 32, and that it would request a 2–level adjustment for obstruction of justice. Frost agreed that the government's representations were substantially correct. He did not say anything to the district court about the earlier plea negotiations. The court accepted the plea and entered judgment against Frost, finding that Frost was fully competent and capable of entering an informed plea, that his plea was knowing and voluntary, and that it was supported by an independent basis in fact. Frost does not raise any issues in connection with this plea and its entrance. The plea had the effect of creating a clean slate, and discussions about any earlier plea negotiations are irrelevant at this point.

■■■ Counsel also raises three potential sentencing arguments addressing (1) the amount of marijuana attributable to Frost; (2) the denial of the acceptance of responsibility reduction; and (3) the denial of the use of the "safety valve" provision, 18 U.S.C. § 3553(f). We have reviewed the district court's sentencing memorandum, as well as the evidence presented during the May 30 and June 1, 1995 hearings. We are convinced that the district court did not err in

its calculation of drugs attributable to Frost's relevant conduct, and that any appeal on that issue would be frivolous. Similarly, we believe that the district court did not err in failing to give Frost a reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). At sentencing on February 5 and 6, 1996, the district court thoroughly addressed the question of the acceptance of responsibility reduction when it determined that it should not apply. After discussing Frost's involvement in the case, the court found that Frost had engaged in "a pattern throughout those plea negotiations and throughout this whole case of denial ... not of his conduct, but of the extent of that conduct, the extent of his involvement." The court concluded, "The viewing of the testimony and the defendants, the reports of the defendant's proffers in total, show a continued and deliberate pattern of refusing to admit the extent of his involvement or his relevant conduct, and for that reason I believe the defendant fails to demonstrate that he is entitled to a 2 level reduction for acceptance of responsibility...."

Finally, as to the last potentially viable sentencing issue, the district court found the safety-valve provision issue to be moot. The district court put Frost in the offense category of 32 with a criminal history category of I, which produced a sentencing range of 121 to 151 months. The court then stated, "[H]aving made that ruling, I deny the defendant's petition for sentencing under 18 U.S.C. [sec.] 3553(f) as being moot in that the safety valve provision and the guideline range here being in excess of the statutory mandatory minimum, it simply doesn't apply." Although the district court's language is slightly unclear, we do not believe that he erred in not applying the provision, particularly in light of his assessment that Frost had been less than forthcoming in describing the nature and extent of his involvement in the conspiracy. See 18 U.S.C. § 3553(f)(5) (requiring defendants to provide truthful information to the government as a prerequisite for the application of the safety-valve provision).

At this point, Frost's only remaining redress against Attorneys Stalker or Hess is a civil action, not this criminal appeal from his conviction and sentence entered after his guilty plea. Because there are no meritorious grounds for appeal presented by either counsel or by Frost, we grant counsel's motion to withdraw and we dismiss the appeal of No. 96–1352.[6]

### Conclusion

For the foregoing reasons, the judgment and sentence of Frank Whitaker in No. 95–3809 are AFFIRMED. Gary Frost's appeal, No. 96–1352, is DISMISSED.

---

**6.** Attorney Falahee also filed a Motion to Withdraw Appearance Instanter and a Motion for an Order to Compel Frederick Hess to Turn Over File Materials to Appellant. Because we dismiss this appeal, we also deny both of those motions as moot.