In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-1104

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PLAZE E. ANDERSON, also known as PLAZE THOMAS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00 CR 83—**Rudolph T. Randa,** *Chief Judge.*

ARGUED OCTOBER 30, 2001—DECIDED SEPTEMBER 19, 2002

Before EASTERBROOK, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* A grand jury indicted Plaze Anderson and four other individuals with conspiracy to distribute in excess of 50 grams of cocaine base, in violation of 21 U.S.C. § 846. Plaze Anderson was the only one who did not plead guilty, choosing instead to go to trial on the charge. The jury convicted him, and he was sentenced to life imprisonment, a $1,000 fine, restitution of $1,420, five years of supervised release, and a $100 special assessment. Anderson now appeals that conviction.

The evidence against Anderson at trial consisted mainly of the testimony of eight other individuals who had pled

guilty and could potentially receive sentence reductions as a result of their testimony. That testimony established that Anderson was their supplier of crack cocaine and that he would front the crack to them and they would pay him after it was sold. The testimony also indicated that Anderson took precautions to ensure that neither he nor the individuals working for him were caught, including moving the drugs among a number of locations, using rental cars to transport the drugs in order to avoid detection, and ensuring that drug transactions did not take place at residences at which Anderson lived. Anderson's defense strategy was to highlight the lack of physical evidence tying Anderson to the crime. In particular, Anderson emphasized the absence of any audio or video linking him to drugs and the lack of fingerprints connecting him to the crime. In response to the parade of witnesses testifying that he was in fact their supplier, Anderson argued that they were testifying to reduce their own sentences and therefore were incredible, and that they had agreed among themselves to frame him in order to obtain that reduction.

To counter that, the government introduced evidence that at least some of the defendants implicated Anderson when first arrested, before they had an opportunity to consult with the other conspirators. Government witnesses testified that the individuals were interrogated separately precisely so that they would not have the opportunity to agree on a cover story. Moreover, the government attacked Anderson's credibility when Anderson testified in his own defense. Anderson testified that he did not know or did not really have a relationship with a number of government witnesses including Franklin Jones, Armando Barrios, and Antonio Grant, as well as with his purported supplier "D.D." Yet the government introduced phone records indicating that hundreds of phone calls were placed from Anderson's cell phone to those individuals over a period of months (including 206 calls to

Jones in a three-month period and 200 calls to Barrios in a one-month period) thus undermining Anderson's credibility.

On appeal, Anderson raises three challenges to his conviction. First, he asserts that the trial court denied him a fair trial by improperly disqualifying a juror on the final day of trial with no alternate available, thus resulting in an eleven-member jury. He further argues that the prosecutor made a number of improper remarks in closing argument, which denied him a fair trial. Finally, he maintains that the government improperly relied on prior statements by witnesses to bolster that witness testimony, thus denying him a fair trial. We consider these arguments in turn, beginning with the challenge to the jury.

## I.

On the final day of the trial, the prosecutor informed the trial court that one of the jurors may have been contacted by parties associated in the case. The prosecutor then recounted a series of events that led to his concern. First, on the preceding day, his office received a call from the District Attorney's office in Racine indicating that there may be a Shelly or a Sandra on one of the current federal juries who knew some of the parties involved in the case. The judges in two ongoing cases inquired of their juries, but found no connection. That night, the prosecutor was contacted by the Racine Police Department, which had received a call from Christopher Mayfield, one of the government witnesses in the trial. Mayfield indicated that he had a conversation with a woman named Holly Christiansen, an intimate friend of his, who in the course of the discussion bet him $100 that Anderson would be found not guilty. Herriot interviewed Christiansen who initially denied knowing anyone on the jury. In a subsequent interview, Herriot learned that she worked for a

woman, Alesia Kinlow-Glosson, who was one of the jurors on Anderson's jury. Christiansen was reluctant to talk, fearing that she and her friend would find themselves in trouble. She wanted immunity for herself or Kinlow-Glosson before she would provide details. She indicated that she was to have been on a jury the week prior in federal court, that Kinlow-Glosson discussed with her some of the intricacies of jury duty, and that Kinlow-Glosson currently was a juror in federal court on a Racine case. Christiansen also stated that she had received a call from Anderson's brother telling her that she should not become involved in the case. Finally, the prosecutor stated that Christiansen also received a call from the Racine County Jail from Willie Buckley, the father of Anderson's girlfriend, who said she was supposed to have been on the jury, and that he thought she was going to "work with them." She later had the discussion with Mayfield which was reported to the police. Christiansen's sister informed the prosecutor that Christiansen was good friends with Anderson's mother, "hung out" with Anderson as well, and thought that Anderson was "too cool" and would be acquitted because he gets his underlings to do the work for him. Christiansen's family also indicated that Christiansen was getting daily updates from Kinlow-Glosson. The prosecutor noted that Kinlow-Glosson was frequently on her cell phone during breaks.

Based on the prosecutor's statements, the court decided to conduct an on-the-record *in camera* hearing, at which the court and the attorneys for each side could question Ms. Kinlow-Glosson individually. At that hearing, Kinlow-Glosson acknowledged that she worked with Holly Christiansen, but stated that she was unaware that Christiansen was a friend of Mayfield. She indicated that Christiansen had been hired by her brother as the receptionist in their family-run business a couple of weeks prior, and that she spoke with Christiansen every day during the trial

in order to get her messages. She denied having discussed the case with Christiansen but acknowledged telling Christiansen that she was in federal court on a trial from Racine County. Kinlow-Glosson then indicated that Christiansen had called her the day before, which she found surprising because she never gave Christiansen her number. Kinlow-Glosson recounted the conversation as follows:

> But she called me, gave me the message, and then she also said to me how is the case going? And she started asking me well, how long are you guys gonna be there, that type of questioning. And then she said—what else did she say to me? She did say—she's like I want you to do me a favor. And then I told her that I couldn't talk to her anymore, because I started getting kind of paranoid, because I didn't even know how she got the number to call me down here. . . .

Tr. at 584. Kinlow-Glosson further asserted that she did not know that Christiansen had any relationship to any of the parties but that she knew Christiansen was from Racine. Finally, Kinlow-Glosson acknowledged that her brother had discussed Christiansen with her the day before. He called to ask Kinlow-Glosson what was going on, and reported that Christiansen told him some federal people had called her at work, and she told him she was going to ask Kinlow-Glosson to deny knowing her. Kinlow-Glosson's brother then encouraged Kinlow-Glosson not to lie and to acknowledge that she knew Christiansen. Kinlow-Glosson maintained that she could be an impartial juror despite those conversations.

After hearing Kinlow-Glosson's version of events, the court determined that she had to be removed from the jury for just cause. The court noted that she was in daily contact during the trial with a woman who knew the parties involved in the case and who was hired only a couple of weeks before the start of the trial. Furthermore, Chris-

tiansen had told Kinlow-Glosson's brother that she wanted Kinlow-Glosson to deny knowing Christiansen. The court determined that some form of contact had clearly been made during the trial between a juror and someone connected to the parties, and that the court could not take the chance that the contact was proper as opposed to improper. The court noted that the situation was even more troubling if it credited the information provided by the prosecutor but stated that it did not have to do so for its decision. The court then stated that it was going to declare a mistrial unless the defendant preferred to agree to an eleven-person jury and exclude Kinlow-Glosson (no alternates were empaneled), an option that the court doubted the defendant would take. After consultation with his attorney, and against that attorney's advice, Anderson agreed to proceed with the eleven-person jury rather than receive a mistrial.

Anderson now contends that the district court abused its discretion in determining that there was "just cause" to dismiss Kinlow-Glosson. Federal Rule of Criminal Procedure 23(b) provides that:

> Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.

Anderson claims that the court could not properly have found just cause for removing Kinlow-Glosson, and that it improperly relied on hearsay from the prosecutor in

making its decision. The latter claim is belied by the record, in which the court makes clear that its determination of just cause is not dependent on crediting the prosecutor's statements. Therefore, the only issue here is whether the court had a sufficient basis independent of those statements to find just cause.

"Just cause" is undefined in either Rule 23 or the advisory committee's notes, and consequently courts have ascertained its meaning on a case-by-case basis. *United States v. Araujo*, 62 F.3d 930, 934 (7th Cir. 1995). Courts have found just cause to dismiss jurors for a variety of reasons, including juror illness or unavailability, and evidence indicating that the juror is no longer able to render an impartial verdict. *United States v. Thomas*, 116 F.3d 606, 613-14 (2nd Cir. 1997). Dismissals based on the lack of impartiality have included myriad factual situations, including jurors who felt threatened by one of the parties, who were discovered to have a relationship with one of the parties, or whose circumstances otherwise changed during the trial so that they were no longer capable of rendering an impartial verdict. *Id.* and cases cited therein; *see also United States v. Symington*, 195 F.3d 1080, 1085 (9th Cir. 1999); *United States v. Barone*, 114 F.3d 1284, 1307 (1st Cir. 1997). That change of circumstances casting doubt on the juror's impartiality may include evidence of improper extrinsic contact. For instance, in *Barone*, the court held that there was just cause for dismissal where a juror was informed during the trial by a Federal Protective Officer that the juror's cousin had been represented by defendant's counsel. Similarly, in *United States v. Edwards*, 188 F.3d 230, 235-36 (4th Cir. 1999), the court found no abuse of discretion where the trial court dismissed a juror who had received a phone call at home telling him that "those two brothers need your help" [presumably referring to the defendants], and the juror indicated that he was surprised that someone had his

home number and was "shocked" and "scared" after the incident. In those cases, the juror's own assessment of his impartiality was not controlling. In fact, the *Edwards* court had not even asked the juror whether he could continue to serve impartially, 188 F.3d at 236, and the *Barone* court held that "a juror's representations regarding her ability to perform fairly and impartially are not dispositive," 114 F.3d at 1307.

We are similarly presented with a situation in which contact outside the trial casts doubt on the ability of the juror to serve impartially. Considering only Kinlow-Glosson's own testimony, the district court had ample evidence upon which to question her impartiality and determine that just cause existed for her dismissal. The court was presented with a rather bizarre sequence of events as set forth by Kinlow-Glosson. She informed the court that Christiansen was hired by her brother to work at the family-run business a mere two weeks before the trial, that Christiansen was from Racine, that she had informed Christiansen that the trial involved Racine, and that she spoke with Christiansen every day in order to retrieve her work messages. She further stated that Christiansen called her during the trial even though she had never given Christiansen her number, that Christiansen asked her some questions about how the case was proceeding and then began to request a favor from her, and that she terminated the conversation because she "started getting kind of paranoid" and did not know how Christiansen even got her number. Finally, Kinlow-Glosson then indicated that she had a conversation with her brother, in which he informed her that Christiansen, after speaking with "some federal people" at work, wanted her to deny that she knew Christiansen. Faced with that testimony alone, the district court certainly could conclude that Kinlow-Glosson's ability to serve impartially had been compromised. Kinlow-Glosson herself was trou-

bled by the conversation with Christiansen and with her brother. Those conversations were enough to indicate that Christiansen had an interest in the case and that she was affirmatively attempting to influence the case. The court was not required to presume that those attempts had fallen on deaf ears, particularly in this situation in which Christiansen had already obtained Kinlow-Glosson's cell phone number without her permission and inquired about the trial in a manner that made her feel "paranoid," and in which Kinlow-Glosson was in daily contact with Christiansen. No further inquiry was required by the court because Kinlow-Glosson's own statements established that she had been adversely affected by outside contact. Of course, the prosecutor's information intensifies the possibility of jury tampering, but that information was not at all necessary for the district court to properly determine that Kinlow-Glosson should be dismissed for just cause. The district court did not abuse its discretion in so determining, and therefore this challenge is without merit.

## II.

Anderson next argues that he was denied a fair trial by the prosecutor's improper remarks during closing arguments. He identifies four categories of improper remarks: (1) vouching for the credibility of government witnesses; (2) comments concerning Anderson's Fifth Amendment right to remain silent; (3) statements regarding the reasonable doubt standard; and (4) references to the larger social context of crime and drugs.

Anderson faces an uphill battle in this challenge because none of the identified statements were objected to at trial, and therefore our review is limited to plain error. *United States v. Scott*, 267 F.3d 729, 740 (7th Cir. 2001). Generally, our review of improper comments by a prosecutor involves a two-part inquiry. First, we examine the com-

ments in isolation to determine if they were improper. *Id.* If we determine that the comments were improper in the abstract, then if the remarks do not violate a specific trial right such as the right against self-incrimination, we must examine the record as a whole to determine whether those comments deprived the defendant of a fair trial. *Id.*; *United States v. Mietus,* 237 F.3d 866, 870 (7th Cir. 2001). We consider five factors in making that assessment: "1.) the nature and seriousness of the misconduct; 2.) the extent to which the comments were invited by the defense; 3.) the extent to which any prejudice was ameliorated by the court's instruction to the jury; 4.) the defense's opportunity to counter any prejudice; and 5.) the weight of the evidence supporting the conviction." 267 F.3d at 740, *quoting United States v. Amerson*, 185 F.3d 676, 686 (7th Cir. 1999). Because Anderson failed to object to the remarks when they were made, the plain error standard additionally requires that Anderson "'establish not only that the remarks denied him a fair trial, but also that the outcome of the proceedings would have been different absent the remarks.'" *Id.*, *quoting United States v. Durham*, 211 F.3d 437, 442 (7th Cir. 2000) and *United States v. Granados*, 142 F.3d 1016, 1022 (7th Cir. 1998). Anderson identifies a plethora of statements, which we will consider in turn but which are not equally meritorious.

Anderson points to a number of statements by the prosecutor which he characterizes as impermissibly vouching for the credibility of the government witnesses. We have identified two related types of vouching which pose the danger of undermining the jury's role as an independent factfinder. *United States v. Renteria*, 106 F.3d 765, 767 (7th Cir. 1997); *United States v. Clarke*, 227 F.3d 874, 884 (7th Cir. 2000). A prosecutor may not express her personal belief in the truthfulness of a witness, because that could place the prestige of the government behind the witness. 106 F.3d 767. And a prosecutor may not imply that facts not before

the jury lend a witness credibility, because that invites the jury to speculate as to the existence of facts outside the adversarial process of the trial. *Id.* Anderson identifies a number of statements in the first closing argument as examples of impermissible vouching, which we consider individually:

> There's been a lot of talk about have you been promised anything? Have you been guaranteed anything? Each and every one of these Defendants has testified. And Plea Agreements—you will have a few of those Plea Agreements here. And Mr. Phillips talked about well, you will get cooperation no matter what, because the Government is going to give you—whether it's truthful or not. As if each and every one of these Defendants would come in and somehow pull the wool over all of our eyes. The Court, the F.B.I., the Racine Police Department, the U.S. Attorney's office.

> This isn't the first drug case we've handled. We don't just trust people off of face value. That's why there are investigations. That's why there's surveillance. That's why people sit out, watch to see who comes, who goes. That's why they check phone records.

Tr. at 683-84. These statements considered in the abstract present the danger of vouching identified above, in that they imply that the jury should trust the credibility determination already made by the government and the court. If the prosecutor had proceeded to so argue, it could well have impacted Anderson's right to a fair trial. In *United States v. Whitaker*, 127 F.3d 595, 606-07 (7th Cir. 1997), however, we held that similar statements approached the direction of impermissible vouching but "had not yet arrived." The prosecutor in *Whitaker* argued as follows:

> When we interview people alleged to be involved in drug trafficking, ladies and gentlemen, we don't take

what these people say at face value. We take precautions to make sure that any individual coconspirator being interviewed, that he is not told what other coconspirators—

. . . I believe you will find that the Government has struck a bargain that is in it's [sic] favor and that these plea agreements assure us of what these witnesses are testifying about. . . .

. . . on numerous occasions the defense attorneys tried to show here that we had suggested to witnesses what to say, that statements of others had been shared with them, and that was simply not the case and you heard the testimony—

*Id.* at 606. Those statements are analogous to the ones before us today, implying that the statements here are not impermissible vouching, although in *Whitaker* the defendant had the benefit of objections to the statements that were sustained by the court. Placing the comment in the context of the argument and the trial as a whole, the potential danger that the statements could be interpreted as vouching is somewhat ameliorated. Anderson's defense essentially was that the government witnesses were all lying in order to obtain a reduction in their sentences and that they had agreed to wrongly accuse Anderson. An issue at trial therefore was whether the witnesses had conferred before making statements implicating Anderson. The above statement represented a response to the notion that the witnesses could obtain the reduction by lying. Similar in nature are two statements identified in the prosecutor's rebuttal:

[T]hey have all the motive in the world to tell the truth. Because the only way they're going to get a time cut is if they are telling the truth.

I didn't fall off a turnip truck two days ago. This is not a complicated case. We look at each aspect of

this investigation. We have looked to corroborate the statements of each individual. . . .

Tr. at 704. We have previously held that it is permissible for a prosecutor to point out that witnesses are required to tell the truth under their plea agreements. *United States v. Clarke*, 227 F.3d 874, 885 (7th Cir. 2000); *Renteria*, 106 F.3d at 767. The initial statement is a proper comment on the plea agreement requirement, and the latter one again is similar to the statements upheld in *Whitaker*. Regardless of whether those statements as a whole neared the line of impermissible vouching or crossed it, as is certainly possible here, it does not warrant a new trial as we will discuss shortly.

Before engaging in that analysis, however, we consider other allegations of impermissible vouching in the prosecutor's rebuttal. First, Anderson objects to the following statement [made in regard to testimony by Mitchell that he had multiple girlfriends simultaneously who gave him keys, and that he stored drugs at their homes without their knowledge]:

> Mr. Anderson talked about Mr. Mitchell. He was proud of sex and he had gotten this preposterous story, according to Mr. Phillips. Doesn't make any sense to him. Well, maybe it doesn't make sense to many people, but I am here to tell you it happens. There are some people in this world that are in need. There are some people in this world that may not—that are a little bit more trusting.

Tr. at 711. Anderson objects to the phrase "I am here to tell you it happens." That remark is a generic statement which would be understood as asking the jury to apply common sense and to consider a competing inference, both of which are proper argument. The prosecutor did not pair it with any personal comments about drug con-

spirators particularly or imply any knowledge foreign to the jury; rather, he placed it in the context of statements about human nature generally, which may properly be considered by the jury. Moreover, it was invited by the defense counsel's closing argument, in which the defense counsel stated that it "isn't true that these girls are that stupid and that he would somehow secure their trust and a key to somehow hide the drugs in the ceiling. I don't have such a ceiling. That's—it's preposterous." Tr. at 695. Therefore, the statement is not improper in the abstract, and considered in context would not adversely impact the fairness of the trial.

Anderson also identifies a more troubling statement on rebuttal:

> Investigator Herriot may be a big guy, but he's not all that intimidating. And I know from personal experience he's a very nice guy. So if he talks to somebody, he's probably talking to them because he's a nice guy, not because he's trying to intimidate a witness that's going to testify.

Tr. at 704, 713-14. That is a classic case of injecting facts within the personal knowledge of the prosecutor into a case, and is blatantly improper. It is the type of error that should have been apparent to the prosecutor, and which will not be tolerated by the courts. Nevertheless, we must consider whether the error impacted the fairness of the trial generally, and additionally under the plain error standard we must consider whether the outcome of the trial would have been different absent the statement.

In the context of the trial as a whole, we cannot say that the plain error standard has been met. Considering all of the allegedly improper statements, there is no reason to believe that the outcome of the trial would have been different absent those challenged statements. The

tenor of the argument as a whole, placed in context, was that the government did not disregard standard investigative rules in taking the statements from the government witnesses, which might have allowed for collusion among them, and that the plea agreements required the witnesses to tell the truth. It thus related to the defense presented. Moreover, the court instructed the jury that they are the ones responsible for determining credibility and that the statements made in closing arguments do not constitute evidence. Most importantly, the evidence against Anderson was overwhelming. The government produced numerous witnesses who testified in detail regarding Anderson's role in the drug conspiracy, and that testimony was consistent in many specifics. Although many of the government witnesses had an interest in the proceeding because they could potentially reduce their sentences, the consistency was found as well in statements taken from initial interrogations before any opportunity to collude could arise. That undermined significantly Anderson's defense. Anderson further weakened his own defense by denying having any relationship with a number of persons who testified against him, when phone records established hundreds of calls from his cell phone to those individuals in a short period of time. In the context of the trial as a whole, and particularly under the plain error standard, the statements do not constitute reversible error.

Anderson identifies other statements as improper, but they are much less significant than the ones already considered. In respect to the reasonable doubt standard, the prosecutor stated that "your job is not to search for doubt, but to search for the truth." Even if that is deemed improper, however, it was invited by defense counsel's own improper attempt to define the reasonable doubt standard in Anderson's closing argument, and Anderson fails to identify any way in which that remark could have altered the outcome of the trial.

Anderson also states that the prosecutor inflamed the passions of the jury by stating in his rebuttal argument: "if you want the cancer to grow, do nothing. If you want a change, the answer is guilty." Tr. at 719. Although Anderson characterizes that reference as an allusion to the drug trade generally, and an attempt to encourage the jury to use the trial to redress social wrongs, that is not borne out by the record. The only other reference to a cancer is in the beginning of the prosecutor's first closing argument, when the prosecutor refers to Anderson as a drug supplier in Racine and states that when dealers are removed from a community without removing the supplier, "they grow back like cancerous growths." Therefore, the reference was to the conspiracy before the jury, and particularly to Anderson's status as the supplier for the dealers. That remark is isolated and alone does not cross the line to an improper comment.

Finally, Anderson argues that the prosecutor impermissibly commented on his failure to testify. The prosecutor in closing argument referred to a conversation that Anderson had with the police shortly after McCree was arrested. McCree's car was stopped because he fit the description of a person wanted for an armed robbery, and the police found over 300 grams of crack cocaine in the car. To provide an alibi for the robbery, McCree informed the officers that he had been at the apartment in which Anderson and his girlfriend resided. The police then proceeded to question Anderson but Anderson denied knowing McCree at that time. The government introduced evidence at trial that McCree was Anderson's cousin. Anderson later voluntarily went to the police station to view a photo of McCree, and declared that he recognized him but did not know his name and did not know him very well. The police then questioned Anderson as to why McCree would have in his wallet two traffic citations issued to Anderson. Anderson indicated

that he did not know how that happened, and refused to answer any further questions. In reference to that incident at closing argument, the prosecutor stated:

At this point, Mr. Anderson says I don't want to answer anymore questions. I am not going to talk anymore. Because he's afraid he is going to be—he's already too close to be associated with Mr. McCree. He's the cousin. He has the traffic citations. He doesn't want to answer any questions . . . because he's smart. He knows only bad things can happen from this point forward, so he doesn't answer.

Tr. 678. That was a proper remark by the prosecutor in the context of this trial. Generally, a prosecutor may not comment on a defendant's decision to remain silent. That prohibition, however, is not absolute. For instance, where a person chooses to testify, the Fifth Amendment is not violated by the prosecution's use of pre-arrest silence to impeach the defendant's credibility. *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980); *Ouska v. Cahill-Masching*, 246 F.3d 1036, 1046 (7th Cir. 2001). Anderson chose to take the stand in this case and testified specifically concerning his decision to remain silent. Anderson testified:

. . . and at that point in time I told the Cudahy Police that I don't want to talk to them about Mr. McCree, because whatever he did, if he robbed somebody of something, I know for a fact that I wasn't involved. Didn't have nothing to do with it. . . . .

Tr. at 615. Anderson therefore addressed his decision to terminate the police interview, portraying it as stemming from his innocence of the crime under investigation. The prosecutor in closing argument may properly point out to the jury another reasonable inference that could be drawn from that sequence of events. There is no error in that remark at all, and therefore no constitutional violation.

### III.

Anderson's remaining claim is similarly unavailing. He argues that the government deprived him of a fair trial by improperly bolstering its witnesses' credibility with their post-arrest statements. Because no objections were raised at trial, our review again is for plain error. He refers to the introduction of testimony regarding statements made by the witnesses to law enforcement officers subsequent to their arrests, which identified Anderson as their drug supplier.

Federal Rule of Evidence 801(d)(1)(b) defines as "nonhearsay" prior consistent statements by a witness that are offered to rebut a charge of recent fabrication or improper influence or motive. Fed. R. Evid. 801(d)(1(B); *Tome v. United States,* 513 U.S. 150, 157 (1995). Such statements are admissible if they satisfy a four-part test:

> (1) the declarant testifies at trial and is subject to cross-examination, (2) his prior statement is indeed consistent with his trial testimony, (3) the statement is offered to rebut an explicit or implicit accusation of recent fabrication, and (4) the statement was made before the declarant had a motive to fabricate.

*United States v. Ruiz*, 249 F.3d 643, 647 (7th Cir. 2001). Anderson asserts that the statements were not offered to rebut allegations of recent fabrication or improper motive. A review of the transcript, however, reveals that this claim is without merit. Anderson's first citation to such offending witness testimony is in fact a citation to a cross-examination by his own attorney. That clearly is not an instance of the government attempting to bolster its witness.

The remaining transcript citations fare no better. All but one of them are to redirect examinations by the government, and in every instance we isolated questions in the cross-examination in which the defense counsel alleged

that the witness had decided to frame Anderson and/or that the witness had consulted with coconspirators while incarcerated in an effort to frame him. That line of questioning was precisely the type of charge of recent fabrication that Rule 801 addresses. The defense counsel's theory was that the coconspirators communicated with each other after their arrests while they were incarcerated in proximity to each other, and that they decided to frame Anderson to reduce their own sentences. The post-arrest statements by those witnesses implicating Anderson, taken before any opportunity to consult arose, were thus admissible to refute the claim that they decided to falsely implicate him later. There are only two references by the government to such statements which arguably did not follow a direct charge of recent fabrication. First, the prosecutor mentioned in his opening statement that three witnesses identified Anderson as their supplier when arrested. Second, on direct examination of government witness Antonio Grant, the prosecutor elicited testimony regarding his post-arrest statement. Those isolated incidents did not deprive Anderson of a fair trial. The initial incident was not evidence at all, but rather was an opening statement that accurately reflected the evidence that ultimately would be introduced. Anderson's counsel in his opening statement made clear that part of the defense strategy would be to allege that the government witnesses colluded with each other to frame Anderson. Tr. at 67-68. Moreover, before the prosecutor began its direct examination of Grant, Anderson's counsel embarked on that strategy in cross-examining Franklin Jones by asking him if he and Marcus Caldwell told anyone in Waukesha Jail that they were going to frame Anderson. Tr. at 96. In any event, the questions by the prosecutor to Grant could not possibly have deprived Anderson of a fair trial because that same information would have been elicited on redirect examination of Grant. In his cross-examination of Grant, Anderson's coun-

sel questioned Grant as to the timing of his statement to police implicating Anderson, and repeatedly asked Grant if he spoke with other persons at the jail about framing Anderson. Those questions regarding the timing of his statement to the police and the implication that he consulted with others to frame Anderson satisfied the requirements of Rule 801 and opened the door to the introduction of the prior consistent statements. The government elicited testimony regarding those statements on redirect, and therefore the introduction of that same testimony on direct examination—even if erroneous—had no impact on the trial. This claim is without merit.

The decision of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*