# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-1677

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

JOSEPH E. DUNKIN,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 354—**Robert W. Gettleman**, *Judge.*

———————

ARGUED DECEMBER 8, 2005—DECIDED FEBRUARY 22, 2006

———————

Before BAUER, POSNER, and KANNE, *Circuit Judges.*

POSNER, *Circuit Judge.*  Joseph Dunkin was convicted by a jury of two bank robberies, committed about a month apart, and was sentenced to a total of 210 months in prison. His only defense at trial was that he had been coerced to rob the banks, and his only complaint on appeal is that the introduction by the government, to refute his defense, of another, unsolved bank robbery that he had committed five years earlier was unduly prejudicial and should therefore have been excluded from evidence under Rule 403 of the Federal Rules of Evidence (he says under 404(b), but that, as we'll see, is mistaken).

In the first of the two robberies with which Dunkin was charged, he gave a teller a note that said "I have a gun, give me the cash," and displayed to the teller what she testified "looked like a gun" or the "nozzle [a delicious malapropism] of a gun." She gave him $1308 and he pocketed the money and left. Surveillance cameras showed an unidentified man in the background during the robbery.

In the second robbery, which was of a different branch of the same bank, Dunkin entered in the company of another man and they talked briefly while Dunkin was waiting in the teller's line. When he reached the front of the line he gave the teller a note similar to the one he had given the teller in the previous robbery, except that it demanded only $300. The teller gave Dunkin a bundle of bills (which he failed to count—it contained only four $20 bills) wrapped around a dye-pack. Dunkin left; his companion remained in the bank. The teller summoned the bank's security guard, who rushed out to the parking lot and found Dunkin sitting in a taxicab covered with the red dye from the dye-pack, which had exploded shortly after he left the bank. Dunkin told the guard that the other men in the parking lot had "made me do it," that they were holding his mother hostage, that they had a machine gun, and that "they always make me do this because I am a homosexual." The guard questioned the men in the parking lot, who denied having had anything to do with the robbery. As for the man who had entered the bank with the defendant, he assisted the guard in arresting the defendant and later returned to the bank in the company of a second man, one of the men who had been in the parking lot. They were seeking a reward. They gave the bank their names.

Dunkin elaborated upon his tale of coercion to the FBI. He said that "Big Ripple," the leader of a drug gang, had ordered him to rob the banks in order to repay a debt of

several hundred dollars that he owed the gang for drugs, and had told him that if he didn't commit the robberies Big Ripple would kill Dunkin's mother, sister, and brother—the last a member of the Illinois state assembly. Big Ripple was attended by other gang members, whom Dunkin identified to the FBI as "Big Unc," "Shorty G," and "Little Mo." Dunkin said that when he left the bank after the second robbery he entered the gang members' car and that was when the dye-pack exploded; the occupants screamed "this shit's on fire" and he jumped out of the car and into the cab.

He also told the FBI that he had committed a similar robbery (hitherto unsolved) in 1998, and that the same gang had made him commit that robbery also. The surveillance video from the earlier robbery was recovered and it showed not only the defendant committing the robbery but also an unidentified man in the background.

The FBI interviewed the two men who had returned to the bank after the defendant's arrest, in (unsuccessful) quest of a reward. One, it turned out, was the driver of the car into which Dunkin had first rushed after the second robbery, and he acknowledged having driven Dunkin to the bank but denied knowing that Dunkin intended to rob it. The other was a homeless man; it was he who had entered the bank with Dunkin. The FBI investigated the two and concluded that neither had any gang affiliation.

A defense should not be submitted to the jury, even in a criminal case, if there is no credible evidence to support it. *United States v. Hendricks*, 319 F.3d 993, 1006 (7th Cir. 2003); *United States v. Nelson-Rodriguez*, 319 F.3d 12, 40 (1st Cir. 2003). Submission in such circumstances is just an invitation to jury nullification, a practice that is improper, though the remedies against it are limited. Dunkin's defense of coercion should not have been submitted. His tale was fantastic and

was refuted by the 1998 robbery (of which more shortly). Even if believed, his testimony would not have established coercion. An essential element of the defense is that the defendant had no alternative to submitting to the demand that he commit a crime. *United States v. Bailey*, 444 U.S. 394, 410 (1980); *United States v. Johnson*, 416 F.3d 464, 468 (6th Cir. 2005). Five years gave Dunkin ample alternatives. In particular, he could have complained to the police immediately after the 1998 robbery, for there is no suggestion that Big Ripple and his associates were holding Dunkin's mother hostage then. Or for that matter after the first of the 2003 robberies. Without a requirement that the defendant negate alternatives to committing crimes, the coercion defense would expand to unreasonable proportions, providing a ready excuse to members of the underworld, whose environment is indeed menacing.

But since the judge decided to let Dunkin present a defense of coercion, the government was entitled to present the evidence of the 1998 robbery to refute the defense. Rule 404(b) of the Federal Rules of Evidence forbids the government to present evidence of the defendant's prior crimes in order to show that he has a propensity to commit crimes, or that he is simply a bad man, and that in either case the jury might as well convict him without worrying whether the government has actually *proved* him guilty beyond a reasonable doubt of the crime for which he is being tried. But there is no prohibition *in the rule* against using prior-crime evidence for other purposes, such as to demonstrate the implausibility of a defense of coercion. *United States v. Cunningham*, 103 F.3d 553, 556 (7th Cir. 1996); *United States v. Sargent*, 98 F.3d 325, 329 n. 1 (7th Cir. 1996); *United States v. Verduzco*, 373 F.3d 1022, 1026-27 (9th Cir. 2004). Dunkin is correct that such evidence can be disallowed if it is deemed unduly prejudicial, but is incorrect that this is

required by Rule 404(b). The rule does not mention prejudice. The pertinent rule is 403, *United States v. Whitlow*, 381 F.3d 679, 686 (7th Cir. 2004); *United States v. Rhodes*, 229 F.3d 659, 661 (7th Cir. 2000); *United States v. Garcia-Meza*, 403 F.3d 364, 368-69 (6th Cir. 2005), which authorizes relevant evidence to be excluded, but only "if its probative value is substantially outweighed by the danger of unfair prejudice" (or by other factors, irrelevant to this case).

The probative value of the 1998 robbery in relation to the defense of coercion was considerable; less obviously, the prejudicial effect was slight. Dunkin had confessed to the two 2003 robberies. So there was no doubt that he was a bank robber, and therefore there was no occasion for the jury to infer from the 1998 robbery that he had probably committed the later robberies as well—they *knew* he had committed them—he confessed them to an FBI investigator, who testified to the confession. Moreover, their commission was an essential premise of the defense of coercion. Dunkin would have been laughed out of court had he testified both that he didn't rob the banks and that he had been forced to rob them.

Of course the jury may have thought him a worse person because he had committed (at least) three rather than two bank robberies. But that rather slight prejudicial effect was dwarfed by the probative effect of the 1998 robbery in refuting his defense of coercion.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*